Good morning, and may it please the Court, my name is Aileen McGrath, and I'm here on behalf of Walmart. I'd like to reserve three minutes of my time, and so I'll try to keep an eye on the clock. I'd like to begin with the text of the arbitration agreement in this case. The arbitration agreement that Walmart and Mr. Johnson, the plaintiff in this case, formed is clear. It requires arbitration of all disputes arising out of or related to the terms of use or any aspect of the relationship between you and Walmart. Everyone agrees, as the District Court found, that that language applies to any disputes about the tires that Mr. Johnson purchased when he entered into that agreement with Walmart during a Walmart.com transaction. As a matter of logic, that language also applies to the dispute in this case that began when the COVID-19 pandemic interrupted Walmart's auto care services. That dispute concerns the value of those same tires, representations that Walmart allegedly made on Walmart.com, and a tire servicing plan that literally has no function apart from those tires and which, in addition, Mr. Johnson purchased while picking up the tires after he arranged for them to be shipped to a Walmart store. Under the same interpretive principles that this Court has applied over and over again, construing language like arising out of, related to, and terms of use, this dispute, the factual allegations underlying this dispute, relate to the contract governing Mr. Johnson's tire purchase. And that is why the District Court here should have granted Walmart's motion to compel arbitration. You started with terms of use. It could fall under the terms of use, or it is related to their relationship. So is the strength of your argument that second section, you're not necessarily suggesting that this services contract falls within the terms of use, it is in fact stemming out of the relationship between Walmart and the purchaser of these tires from the purchasers of the tires? Is that what you're saying, Justice? No. I would actually say it's the opposite, Judge Sessions, and we think that the first prong in the arbitration agreement, I think either prong covers the dispute here, but our primary argument is that the terms of use is the agreement that Mr. Johnson entered into when he purchased those tires. It is effectively the purchase agreement for those tires. And the dispute here... What I don't understand is when you're signing a contract for services, for, you know, these maintenance of the tires and the lifetime care of the tires, that's like in substance a totally different thing than the purchase of the tires, isn't it? I think in this case, in this case, it's not. And what we have to look to in this case to understand the relationship is the factual allegations underlying the dispute, to see whether that dispute relates to the tire purchase. And here, not just as a matter of logic, but as a matter of how Mr. Johnson has pled the allegations in the complaint, there is that relationship with the tire purchase. I mean, we can start with the allegations in the complaint. What is the measure of damages that Mr. Johnson seeks? He doesn't simply seek the $40 that he paid to obtain the tire servicing, the lifetime tire servicing plan. He also seeks the $500 in lost value of tires or, I should say, that's the value of the tires. He seeks lost value of the tires as well as a remedy for breach of that agreement. Well, I don't know why that makes them, you know, so interconnected. He alleges breach of the service agreement. Right? He alleges... And if he proves breach of the service agreement, proves the terms of the service agreement, he's entitled to reasonable damages, correct? I think that's correct, and that highlights exactly why this dispute still concerns the tires that he also agreed to arbitrate when he disputes the rising ever relief tax. Well, the separate maintenance agreement wouldn't really have any meaning if he had purchased the tires, right? Right. That's exactly right. You don't just go down, you know, today I think I'm going to buy a, you know, a car maintenance agreement for my three-year-old tires. Nobody would sell it to me in the first place, but... Well, I think that exactly proves our point here, is that the dispute here, that servicing plan has no function without those tires. Well, how do you... In this case... I don't understand how you read the arbitration clause in the tire purchase agreement to encompass the maintenance agreement. Well, then I think if you have doubts there, Judge Paius, I think then that does get us into the prong of the arbitration agreement that Judge Sessions was asking about, which is the any aspect of the relationship prong. I do think that this more straightforward path for the court to resolve this case is to say that when you look at the allegations underlying the dispute, which is what this court's precedent makes clear, you have to look at in deciding whether a dispute is arbitrable. Those allegations are inextricably intertwined with the tire purchase. So we're going back to this, it's either the terms of use or it's the relationship. And if it's just the relationship which is created between Walmart and the purchaser of tires, where is the end to that relationship? If that person wants to go buy not just the service agreement, but wants to go buy something else from Walmart, do they claim the arbitration agreement applies? And where is the limit there? No. So the answer is no, we don't claim that the arbitration agreement applies. And the limit is found in the meaning of the term relationship. I mean, I want to be very clear about what this arbitration agreement says. It does not say that it extends to any and all disputes between the parties. If that's what Walmart had wanted it to say, it would have written it this way — that way. And so you have to give some meaning to the any aspect of the relationship language that stops short of that broad interpretation. I mean, that's what we— But the language, Ms. McGrath, what's the language in the terms of use that limits it from, as you say, you know, all disputes? What's the limiting language in the terms of use? I think that you find the limit of the meaning of the word relationship by looking at the context of the entire terms of use. And here, I don't think we actually part ways that significantly from what Mr. Johnson has said in this case. He has said that the online relationship, that the online context is an important part of the relationship. And here we don't disagree. We think that Mr. Johnson and Walmart entered into a buyer-seller relationship. You know, the cases that say — teach us that everything is related to everything else. So that could, as Jed Sessions intimated, this could go on forever. But let me change the subject to something more foundational, because I don't know where I stand on this. Neither you nor the appellee really, in your briefs, sets forth what law governs in the sense that, first on the terms of use, does the terms of use say it's governed under — by what law, in what state? It's governed under California law. And I think here and below, the parties all agree that — The terms of use in California law? That's correct. OK. Now, what about the fact that if the purchase of the — I'll call it the — was made in Texas, right? I believe that's correct. I believe that's correct, Your Honor. Now, does that mean that that agreement is covered by Texas law? It should be interpreted under Texas law, the meaning of that sales agreement? We've never made that argument, Your Honor. I think the parties have always — What? No. Our position is no. That the dispute here is governed by California law, that the question of the meaning of the terms of use is governed by California law, subject to the constraints that the FAA places on that analysis. What you're saying is, if a customer goes into a Walmart store in Los Alamos, Texas, and says, I'd like to buy a tire rotation servicing agreement, and buys it at the store, it's governed by Texas law, right? I think that's a different circumstance here. Unless, under your theory, you know, it's an add-on to the purchase of a set of tires. But if it's not, it's governed by Texas law, isn't it? I think — I believe — I don't believe that's in the record, Your Honor. I think that's — That's why I'm asking. That's exactly why I'm asking. It's not in the record. In other words, you know, neither party discusses what law might govern that transaction. And I think that's because — Neither party disputes that if we were just talking about a transaction where the plaintiff had not entered into an arbitration agreement, if we're talking exclusively about someone who goes into a Walmart store and purchases a tire servicing plan, that dispute would not be arbitrable. But that would be a different dispute from the one we have here, where the plaintiff did enter into an arbitration agreement. No one has ever disputed the California law governs the questions that we are discussing today. And — and — and the — the point and the reason that this case is arbitrable is because the dispute still relates to and arises out of that original tire purchase. And we think that's clear as a matter of the way that the Court has interpreted phrases like arising out of and related to. Those — those phrases, as this Court knows well, have a broad meaning. Related to simply requires a logical or a causal connection between the tire purchase, the agreement to purchase those tires, and the dispute here. And here, I think whether you look at it as a matter of logic, when you look at the five-day span of time between when Mr. Johnson ordered those tires online and when he purchased the tire servicing plan, when you look at the fact that at the time he bought those tires, during the online transaction, he arranged for them to be shipped to a Walmart store for pickup and installation. And when you look at the fact that that servicing plan has no function whatsoever without those tires, that he has agreed to arbitrate any disputes concerning, that that is more than enough under this Court's precedent, which we are not asking this Court — So — so let me ask you this. If he was only asking for $40, that would be different? I don't — I think that — Assume — just assume all he asked for was $40. I think our position here would still be that this dispute is arbitrable, because the remaining allegations about the tires would still — Wait a minute. Wait a minute. Doesn't the arbitration clause exclude small claims matters? It does exclude — it does exclude small claims. Well, that $40 today must be a small claims matter, although I haven't been to small claims quite recently. I haven't been to small claims either, but — To — and I'll stick with Judge Paez as — I'm sorry, Judge Tsushima. Let me ask you another hypothetical. Suppose at the time Mr. Johnson went to the Walmart auto shop in Texas to get his tires installed. Instead of — instead of buying this tire rotation service agreement, he looked up on the shelf. He saw a can of — I don't know what you call it, but it's a can of pressurized air, you know, so you can — you can — you can fill your flat tire permanently just by plugging this aerosol can into your tire, right? Suppose he bought that, all right? At the same time he was getting his tire installed. And then, you know, he tried to put — and then he was off on a trip. He tried to put the can into the tire, and the whole thing exploded, blew off his hand. Is that governable arbitration? I don't — I think that a claim for injuries arising from the tire pressure canister blowing his hand off would not be arbitrable. And I think that — Is it because the language of the agreement excludes personal injury? I think it's because the language of this agreement — and even focusing on the broader language, the any aspect of the party's relationship language — I think that language incorporates a common-sense, plain-meaning, textual definition that requires the court to — to interpret it as having some boundaries. I mean, we know that from the court's precedent. But this is tort. I'm sorry? They're based on — in contract, tort, statute, or fraud. Oh, certainly. I mean, I think this agreement — this agreement is drafted pretty typically. It would include, you know, product liability, tort claims that arise from those tires, certainly. At the same time, I think that personal injuries stemming from intervening events that are far afield from the tire purchase here would not be covered because they don't — Wait a minute. This is not far afield. You know, he's trying to fill the tire he bought online from Walmart. It's right — right, you know, related directly to the tire. I think that the best I can tell you is, number one, that Walmart would not take the position that that dispute is arbitrable. And number two, I think this gets to the point that this court has made in Revich about the value of hypotheticals in cases like this, where we're talking about the scope of an arbitration agreement. Is there inevitably will be — You referred at one point to, you know, well, you know, it's all governed by common sense. But, you know, common sense to some people, you know, don't have any boundaries, right? You can't apply it objectively. What's common sense to me might be garbage to you. I think — I think, again, the best that I can do there is to point to the black-and-white terms in the context of this particular agreement. This is — and I see — you know, I will finish answering this time, but I would ask this question. But I do — I do hope to save some time for rebuttal. I think that the Ward relationship has to play some role in the meaning of this arbitration agreement. The fact that Ward could have the broadest meaning possible, we know from this Court's decision in my left foot that the Court doesn't give it that construction. Instead, it looks for a reasonable limiting principle. And here, that limiting principle is found in the nature of the party's relationship, which is a buyer-seller relationship, but it encompasses disputes that are typical. I'll give you a couple minutes for that. All right. Thank you, Your Honor. Thank you. We'll hear from your — from the other side. May it please the Court, for plaintiff — appellee, Mr. Johnson. One of the things I've noticed in review of the appellant's brief is that the appellant likes to engage in what the appellee should do at trial. And generally speaking, I generally don't get advice from the other side. In my cases, I don't like to take the advice here. I think it's appreciated, but will decline. Plaintiff doesn't concede there's any valid arbitration agreement at all, period. It's an open issue. The district court didn't address it. The district court deferred on that issue, finding there is no agreement to arbitrate between the parties that's enforceable. Plaintiff agrees there is an agreement, but whether it's valid or enforceable is yet to be decided. That's not conceded. Plaintiff says the district court — we believe the district court got it right. But whether — regardless of the status of the agreement, it doesn't apply to this dispute. There's no agreement formed to address the service contract that plaintiff purchased. There's no meeting of the minds. So let's — maybe we could — you could do me a favor and respond to counsel's relationship argument, which seems to be the core now of her argument. In the — I don't have the exact site, but I don't believe there is any actual limitation in the appellant's argument that there is a hard stop as to that relationship. I think the language in the argument is that it's a broadly interpreted — it should be broadly interpreted. We have put in our papers and the amicus has put in their papers different scenarios that could be foreseen speculatively, that could be subject to a very broad arbitration agreement that the plaintiff didn't enter into, but that could be in some other situations applied. We don't know what the situations are at this point. All we have is the facts of this case. But the facts of this case is a service contract, which was noted was entered into in Texas, though it was as the — Let me ask you this. That service contract is always connected — I don't want to connect it or relate it to whatever. I mean, it arises in the context of the installation of the tires. The way we look at this and the way the district court looked at it is that there was an agreement relating to the terms of service for some online activity. Again, setting aside the enforceability of it, that that was the agreement and that that agreement didn't encompass the service contract. The concept that it arises isn't really in the record. There's a lot of assumption. I think the court itself said that you couldn't have a service contract without the purchase of tires. That's theoretically not true. You can have two separate contracts. It is theoretically possible to buy tires and have someone else install them. The facts for this case aren't in the record on that point, but there's a lot of assumption in the appellant's papers that things have to flow a certain way, but they don't. You have a service contract. You have a purchase of a physical object contract. They're also governed by... Well, I don't want to speculate as to... Those things aren't on the record, but there are two different things. There are two different fundamental items. One is service from basic law. They are related, aren't they? Excuse me? But they are related. Well, related is very broad. They're related in that both the parties are the same. I sense in that sense they're related, Your Honor. That's true. They both have the word Walmart in them, and they both were paid for by the same party. Not just that, but the service was to be performed on the tire that he bought at Walmart. Yes, but he has no complaint about the quality of the tire or the timing of the delivery. There's no issue with the tires themselves. Well, wait a minute. You said related. You didn't say issue. Well, I guess what I'm saying is that the issue that caused the lawsuit is that the service contract was breached. That's the claim. Not that the tire contract was breached. And it's the service contract. Again, I think as the court mentioned earlier, that is about one argument, and one of the remedies is restitution for the value of the contract. Anyways. That's not the only thing you may be seeking, correct? Well, you're not seeking the lost or the, I guess, the diminution in value of the tires. I don't know how you'd ever prove that. That's not in the record either how that would be proven. I understand, but aren't you also seeking that as well? So the idea is that if you can't do your tire rotations on time, then you suffer a harm. But that doesn't mean... You can't use the old tires to fix the harm from the accelerated depreciation of the tire. That means you have to get new tires. So maybe that's an argument. We're not there yet. We're at the procedural stage. How the case is actually tried is far off in the future. At this point, it's a pure procedural issue of the contract, which was never formed, to arbitrate the tire service contract. Is it your point that the first contract, that's the purchase of the tires, relates just to the purchase of the tires? There's no other issues which are likely to come up, whether they're valid or not, whether the tires... Well, you could bring an action if there's a violation of the sale of those tires. But a service contract is totally separate. So by a service contract, Walmart is offering to do all of these balancing services over time. And so that your then lawsuit for a violation of that service contract would relate to the services that were provided. Nothing to do with the quality of the tire. That's a totally separate contract. Isn't that what the magistrate judge found? Essentially, you were talking about a totally separate series of issues which relate to a services provision, as opposed to the actual tires, which are totally separate. Exactly, Your Honor, yes. And at the time of the... The way that the district court looked at it is that there was no meeting of the minds for the terms of service with respect to the service contract because that was done in a separate transaction. And that wasn't the way... Interesting. Nobody's mentioned the introductory language to the contract for the purchase of the tires. And in the terms of use contract, welcome to the family of websites and applications provided by Walmart. These terms of use govern your access to and use of all Walmart sites. So your argument, or at least the court below, found that this contract really deals with your access to sites on the internet. I'll get to that in a point, but because there are some specific examples that support that reading exactly. And I think the context is missing from the appellant's briefs. But yes, that was exactly the basis for the district court's ruling.  were addressed in the questions, Your Honor. Well, you could say that there is a, you know, there's even a definition of Walmart sites in the terms of use. Well, I think what we say is that the California law, which is the law to interpret this, is to look at the document as a whole, to look at it from the point of a reasonable person. And a reasonable person looking at this terms of service would think that it applies to the activities on those Walmart sites.  that that would cause a problem. And I think that's what we're trying to do. this contract to apply to them. And that's what the court ruled. And that's our basis. And there's a lot of speculation of what Walmart could have done. But the district court ruled on the terms of service that was drafted and presented. And that's all that's before it. And that's what we're basing our argument on that as drafted, there is no agreement to apply to plaintiff's service contract purchase. And we don't concede there's this argument that there's an online and offline dichotomy. We don't concede that at all. All we're saying is that as drafted, it doesn't apply to this. There's no agreement formed to apply to this transaction, the service contract. We don't buy into the either or fallacy. We were looking for evidence of the contract, the service contract. We saw there's a receipt which basically recognizes that it's a life promise to fix the tires. But there was no actual contract in the record. Is that correct? And a contract would say, this is what Walmart's responsibilities are under the service contract. They have to do X, Y, and Z. The remedies may be X, Y, and Z. Any issue in regard to arbitration may be X, Y, and Z. There's nothing. There's nothing in the record about the service contract itself. Is that correct? I believe that's accurate, Your Honor. I think that's something that we would anticipate to find in discovery. And again, it's not in the record, but I believe there's like an advertisement in the store. Well, there's an advertisement on the website. And that's one of the linkages that Walmart wants to make, that there is an advertisement for the services contract on the website, which may then link to terms of use. Yeah, that is one of their arguments. But that's not, there's no factual, well, the record speaks for itself. But in terms of what Mr. Johnson saw, he went in person and bought it in person. What he saw would be what's in person. But to move along, if I've addressed that as best I can. Another point we'd like to address is that the district court, of course, got it right, is the appellee's point of view. But the argument is that because the appellee at the lower court level didn't argue the case as eloquently as the district court ruled in their opinion, that somehow that means that this court needs to rule against the appellee and reverse the district court. I don't think the district court is bound by the detail of the papers before it. If the district court made the correct decision, though Mr. Johnson perhaps didn't argue it as well as the district court did, I don't believe that's a grounds to overturn the district court's decision. Now, addressing the last point I'd make on this point is that the language of the terms of service does reflect no agreement to arbitrate service contract purchases that are separate from online activity. And the example we used is this language in the terms of service about this free license to use art. And that comes up with the idea, we believe if you do a product review on their website, you put a picture of yourself reviewing something on their website, then they get to use that, that's part of the deal. The two examples the appellant gives is that there's this, at page 15 of the reply, that there's this promo email restriction. You can't use the site for promotional emails, that spoof walmart.com. The context for that, I believe, is that there's an old practice where you can, the way websites are designed, it's all text HTML. So anybody can go there and copy that, and then they'll have an exact copy of Walmart's website. What Walmart is saying is that if you come to our website, you can't copy the whole thing, make your own Walmart with a different website and try to fake people into going to your website and stealing credit card information, things like that. You can't use our website materials and make an email to make it seem like you're Walmart. This then just, this gives them the right to say that that's our stuff, you're stealing it and you're faking us, and that we have some kind of agreement to go after you because we're saying we own it. Because the nature of the World Wide Web is that everything that you post on a website is publicly available and copyable. So I think that's what that's addressing, which is online activity, which is exactly what the Terms of Service is supposed to cover. Another one here is U.S. export laws. They say this has something to do with external activity. If you go buy books at a merchant in person, there's a lot of law about you can then sell those books. You can sell those things as you like. They're yours now. What Walmart's doing here is, again, for the online purchase, giving an additional term, saying that if you buy your things on walmart.com, we want you to not resell it in violation of law. So there is a context, and it ties into the district court's decision, which is that the Terms of Service are to regulate activities on the sites, not other things as drafted. And again, I think I'll just conclude if there's no other questions, that this is a question of formation and the meeting of the minds to the service contract never occurred. The district court's decision should be affirmed and if not affirmed, remanded so that the court can address any other issues which weren't addressed in the first place. Thank you. Okay. I'll have the two. Thank you, Your Honor. I'd like to just respond to Judge Sessions' question about the relevance of the prefatory language. We are not taking the position that that language doesn't matter. Of course, it matters. Of course, you have to read the agreement as a whole. But what that language does not mean is that provisions within the agreement, that once they touch on any conduct that occurs offline, that the whole agreement just blows up. And that's effectively what the district court here did. And I also want to be clear that I am not hypothesizing or making any assumptions about how this case is going to be litigated. I think our position is drawn from the allegations in the complaint. And what do the allegations in the complaint say? They, just like other provisions in the contract, just like the provisions that we set forth on page 14 of our reply brief, concern to some extent an in-store purchase, but they also arise out of and relate to the tire purchase. Those allegations include the damages request. They include the allegation about advertisements that Walmart allegedly made. The complaint contains no reference to any other advertisements other than those made on walmart.com. The terms are described as extending to qualified tires, running to the original purchase date, which we argued below and it was undisputed, refers to the purchase date of those tires. All of those allegations mean that the basic questions in this case, whether Mr. Johnson was entitled to tire rotation services, he did not receive, whether and to what extent he was damaged can only be answered by looking at those tires. But the focus of the litigation is really on the services that were provided or the inadequate services that were provided. That is what the lawsuit is all about. It is true that in regard to proving the relationship, they talk about the value of the tires because that becomes relevant. I assume if the tire is worn, you figure out what the tire is worth at the time when there's a breach. And the advertisement is mentioned as well, but the real thrust of the lawsuit relates to the services. That doesn't relate to the purchase of the tires. Isn't that correct? I think that for purposes of deciding arbitrability, what we know from this court's precedent is that you look to the factual allegations in the complaint to see if they touch matters covered by the contract containing the arbitration clause. It is not necessary to look at what the overall thrust of the litigation is going to look like. But even viewing it through that lens, I think that the online activity that everyone agrees is covered by the arbitration agreement is still going to be front and center. I mean, in his answering brief here, Mr. Johnson doubles down on the relevance of advertisements. He says the whole point of this lawsuit is to get Walmart to conform its conduct to advertisements. Again, the only advertisements appear online. The damages that he seeks are keyed expressly to the value of those tires. He purchased. There is no evidence, as I think he just conceded, in the record of any separate agreement regarding the tire servicing plan. The only evidence of any agreement is to arbitrate claims about those tires. And the servicing plan, as I said, has no function without those tires. And so I think there's no reason to infer, particularly given the absence of any independent agreement, that the parties here have not intended to arbitrate this case. Thank you. Thank you. Thank you, counsel. We appreciate your arguments this morning. And the matter is submitted at this time.
judges: TASHIMA, PAEZ, Sessions